DS138876
SEALED
ORIGINAL
CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED
2022 JUN 21 AM 10: 16
DEPUTY CLERK mb

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX. REL. SYED HASAN, RELATOR | § | |
| | § | |
| Plaintiff | § | 3-22CV1333-E |
| v. | § | CIVIL ACTION NO. ____________ |
| | § | |
| HEAL 360 URGENT CARE PLLC, HEAL 360 PRIMARY CARE PLLC, AND DR. MOHAMMED AMER MOHIUDDIN, | § | |
| | § | |
| Defendants. | | |

**COMPLAINT**

Plaintiff United States of America Ex. Rel. Syed Hasan ("Relator") files this Original Complaint against Defendants Heal 360 Urgent Care PLLC ("Urgent Care"), Heal 360 Primary Care PLLC ("Primary Care" and, collectively with Urgent Care, the "Medical Practice Defendants"), and Dr. Mohammed Amer Mohiuddin ("Mohiuddin" and, collectively with the Medical Practice Defendants, "Defendants").

**NATURE OF ACTION**

1. Over the course of April 2020 through March 2022 – a period of two years – the Defendant Medical Practices, acting in concert with and under the direct control of their principal, Mohiuddin, operated dozens of drive-through, mobile, and "pop-up" COVID-19 testing centers in Texas, Oklahoma, California, Michigan, and New York. The ostensible purpose of Defendants' enterprise was to provide immediate COVID-19 test access to individuals who sought medical testing of their COVID-19 status. In actuality, Defendants engaged in a widespread, multi-state fraud, waste, and abuse scheme in order to profit – at the expense of the federal government – from the extreme demand for COVID-19 testing at the height of the pandemic.

2. The primary objective of Defendants' fraud scheme was to collect federal healthcare program funds by submitting false claims for reimbursement. Defendants' scheme resulted in the submission of vast numbers of false and fraudulent claims to federal Healthcare Benefit Programs for COVID-19 diagnostic testing services that were not performed as described or coded, not provided as represented, and/or not medically necessary, such that they were wholly ineligible for reimbursement.

3. The specific fraud committed by Defendants included systematically and routinely (a) billing for more expensive services or procedures than were actually provided or performed, commonly known as "upcoding" – i.e., falsely billing for a higher-priced treatment than was actually provided; (b) misidentifying the rendering provider for evaluation and management ("E/M") services; (c) misrepresenting the patient's diagnosis by inflating the patient's diagnosis code to a more serious condition so that it appears consistent with the false procedure code; (d) disregarding supervision requirements for the services rendered; and (e) performing medically unnecessary diagnostic-testing and related services solely for the purpose of collecting federal healthcare program reimbursements.

4. At this juncture, Defendants control the information necessary to quantify the resulting damages. A cursory review of the government database tracking reimbursement payments by provider reveals that as of May 27, 2022, Mohiuddin alone had received well over *$40 million* in reimbursements for COVID-19 testing under the Uninsured Program alone, placing him in the highest 0.1% of all providers in terms of dollars received under the Uninsured Program alone. *See* Ex. A (excerpt from U.S. Government report on COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program). This figure does not include reimbursements from other federal healthcare

programs such as Medicare Fee-For-Service payments. Based on the evidence and facts developed to date and without the benefit of discovery, Relator is informed and believes that the total loss to the federal government is staggering and likely amounts to tens of millions of dollars or more.

5. Relator brings this action on behalf of the United States to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

## JURISDICTION

6. This Court has subject matter jurisdiction to entertain this False Claims Act action under 28 U.S.C. §§§ 1331, 1345 AND 3732(a). The Court possesses supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

7. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and (b) because Defendants have minimum contacts with the United States and reside in, and/or transact and have transacted business in this District, and because Defendants committed acts within this District that violated 31 U.S.C. § 3729.

## VENUE

8. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Defendants reside in and/or transact business in this District, and because Defendants committed acts within this District that violated 31 U.S.C. § 3729.

## PARTIES

9. Relator, an individual citizen of the United States of America, domiciled and residing in Dallas County, Texas, brings this action on behalf of the United States Department of Health and Human Services ("HHS").

10. HHS is a federal government agency responsible for administering and overseeing federal healthcare programs (i.e., Medicare and Medicaid), including program activities, operations, and contracts.

11. Defendant Heal 360 Urgent Care PLLC is a Texas professional limited liability company which has transacted business in and/or is transacting business in this District. It may be served with process through its registered agent, Mohammed Amer Mohiuddin, at its registered office address, 1313 Bravura Dr., Plano, TX 75074.

12. Defendant Heal 360 Primary Care PLLC is a Texas professional limited liability company which has transacted business in and/or is transacting business in this District. It may be served with process through its registered agent, Mohammed Amer Mohiuddin, at its registered office address, 1313 Bravura Dr., Plano, TX 75074.

13. Defendant Mohiuddin is an individual residing in this District. He may be served with process at his residence, 1313 Bravura Dr., Plano, TX 75074.

## FACTS

### A. The False Claims Act

14. Congress amended The False Claims Act, 31 USC §§ 3729 – 3733, *via* the Fraud Enforcement and Recovery Act of 2009 ("FERA"), P.L. 111-21, § 4(f), 123 Stat. 1621.

15. FERA, at 123 Stat. 1625, provides: "The amendments made by this section [amending 31 USCS §§ 3729 – 3733] shall take effect on the date of enactment of this Act[1] and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if

[1] The date of enactment is May 20, 2009, the date President Obama signed FERA into law. Parts of the 2009 law were also amended in July 2010 by the Patient Protection and Affordable Care Act, 42 USC §18001 et seq (2010), also applicable here.

enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date…."

16. The False Claims Act as amended by FERA provides, in pertinent part:

> (a) Liability for certain acts.
>
> (1) In general. Subject to paragraph (2), any person who -- (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…. (G)…knowingly conceals or knowingly and improperly avoids…an obligation to pay or transmit money…to the Government…is liable to the United States Government….
>
> (b) Definitions. For purposes of this section—
>
> (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;
>
> (2) the term "claim" (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

**B. <u>The Federal Healthcare Benefit Programs</u>**

17. At all times relevant to this Complaint, the Medicare Program ("Medicare") was a federal health care program providing benefits to persons over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency

under the HHS. Individuals who received benefits under Medicare are referred to as "Beneficiaries."

18. Medicare is divided into four parts. Of primary importance in this case, Medicare Part B provides outpatient coverage for health services provided by outpatient hospitals and professional services rendered by physicians and other providers (collectively, "Providers").[2]

19. Medicaid Managed Care provides for the delivery of Medicaid health benefits and additional services through contracted arrangements between state Medicaid agencies and managed care organizations ("MCOs") that accept a set per member per month (capitation) payment for these services.

20. Medicare, Medicare Advantage plans and Medicaid Managed Care plans (collectively, the "Healthcare Benefit Programs") are Healthcare Benefit Programs as defined by Title 18, United States Code, Section 24(b) and a "Federal Health Care Program" as defined by Title 42 USC § 1320 a-7b(f).[3]

21. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") mandated the adoption of the National Provider Identifier ("NPI") number. An NPI number is a unique 10-digit number that identifies a covered healthcare Provider for healthcare transactional purposes. A Provider is required to include its assigned NPI number when submitting claims for insurance reimbursement.

---

[2] Medicare Part A provides inpatient/hospital coverage for health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare Part C—also known as Medicare Advantage—offers beneficiaries the opportunity to secure coverage from private health plans ("Contractors") for many of the same services that were provided by Parts A and B, in addition to certain mandatory and optional supplemental benefits. Medicare Part D provides prescription drug coverage.

[3] Federal Healthcare Benefit Programs relevant to this action may also include the TriCare, Veterans Health Administration, and Indian Health Service programs.

22. A Provider is further required to be enrolled with the Healthcare Benefit Programs in order to submit claims. To enroll in Medicare, a Provider is required to enter into a participation agreement with CMS in which the Provider agrees to comply with all applicable statutory, regulatory and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the Provider certifies its understanding that payment of a claim was conditioned on the claim and the underlying transaction complying with the Medicare regulations, Medicare program instructions and federal law, and on the Provider's compliance with all application conditions of participation in Medicare. A similar agreement is required of Providers enrolled in Medicare Advantage plans and Medicaid Managed Care plans.

23. Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A). A Provider has a duty to provide services only when they are medically necessary. 42 U.S.C. § 1320c-5(a)(1). A Provider is authorized to submit reimbursement claims to the Healthcare Benefit Programs only for services that were medically necessary and actually provided to a Beneficiary. All healthcare Providers, including physicians, must comply with applicable statutes, regulations and guidelines, including those issued by the Fiscal Intermediary, in order to be reimbursed by Medicare Part B.

24. Medicare requires compliance with the terms on the claim form as a precondition of governmental payment. When a Provider submits a claim form, the Provider certifies that the services in question were "medically indicated and necessary for the health of the patient" and "were personally furnished by me." The claim form states, "No Part B Medicare benefits must be paid unless this form is received as required by existing law and regulations." On a claim form, a Provider must state, among other things, the procedure(s) for which he or she is billing Medicare.

25. In order to receive payment for a service covered by the Healthcare Benefit Programs, a Provider is required to submit a claim for payment electronically or in writing. The claim submitted by the Provider must identify, among other information, the Provider submitting the claim; the Provider providing the service; the Beneficiary receiving the service; the services rendered; the diagnosis or nature of the illness or condition treated; and the date of service.

26. The Healthcare Benefit Programs pay for claims only if the items or services were actually performed, medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and provided as represented.

## C. **The HRSA COVID-19 Uninsured Program.**

27. The HHS Human Resources & Services Administration ("HRSA") administers the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing and Treatment of the Uninsured Program ("Uninsured Program").[4]

28. The Uninsured Program was funded by COVID-19 related legislation, including the Families First Coronavirus Response Act ("FFCRA"), the Coronavirus Aid, Relief and Economic Security Act, the Coronavirus Response and Relief Supplemental Appropriations Act and the American Rescue Plan of 2021.

29. The Uninsured Program provided claims reimbursement to health care Providers, generally at current year Medicare fee schedule rates, for testing uninsured individuals for COVID-19, treating uninsured individuals with a COVID-19 diagnosis, and administering COVID-19 vaccines to uninsured individuals. Testing-related visits covered by the Uninsured Program

[4] For ease of reference, references to the federal Healthcare Benefit Programs in this Complaint include the Uninsured Program.

included COVID-19 testing in the following settings: office, urgent care, emergency room or telehealth.

30. The Uninsured Program included Provider reimbursement for COVID-19 testing provided on or after February 4, 2020. The Uninsured Program began accepting claims on May 6, 2020, and stopped accepting claims on March 22, 2022, due to lack of sufficient funds. During that almost two-year period, HRSA paid approximately $18,784,822,233 in claims for COVID-19 testing, treatment and vaccination under the Uninsured Program.

31. For a Provider to participate in the HRSA Uninsured Program he or she must (a) enroll as a participating provider; (b) verify each patient's eligibility and benefits; (c) submit each patient's information; (d) submit clean and accurate claims; and (e) receive payment via electronic direct deposit.

32. For a claim to be eligible for reimbursement under the Uninsured Program, a Provider was required to attest to its full compliance with the Uninsured Relief Fund Payment Terms and Conditions as a material inducement to the HRSA's decision to disburse, and to verify, attest, and certify among other things that:

- the Provider provided the items and services identified on the Provider's claim form to the Uninsured Individuals identified on the claim form;
- that all items and services for which Payment is sought were medically necessary;
- the Provider has made a reasonable inquiry for health care coverage eligibility and confirmed to the best of the Provider's knowledge at the time of claim submission, the patient was uninsured at the time the services were provided and no other payer will reimburse them for COVID-19 testing for that patient. For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and/or vaccine administration, this means that the patient did not have any health care coverage;
- that all information the Provider submits as part of its application for payment is true, accurate and complete, to the best of its knowledge;
- that any deliberate omission, misrepresentation, or falsification of any information contained in a request for reimbursement report may be punishable by criminal,

civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment; and

- the Provider will agree to program terms and conditions and may be subject to post-reimbursement audit review.

A Provider's noncompliance with any applicable Term or Condition is grounds for recoupment by the HRSA of the payments made.

33. The HHS tracks and reports grant spending at the transactional level *via* its Tracking Accountability in Government Grants System ("TAGGS"). Among other things, the publicly available TAGGS database discloses the total amount of claims paid for COVID-19 testing to each Provider that agreed to the Uninsured Program's Terms and Conditions and received claims reimbursement for the COVID-19 testing, treatment, and/or vaccine administration of uninsured individuals.

**D. <u>CPT Coding for Evaluation and Management (E/M) Services</u>.**

34. Medical coding is the process of translating healthcare diagnoses, procedures, medical services, supplies, and equipment into universal alphanumeric codes. Medical coders extract information from the patient's medical record and translate them into standardized codes (HCPCS, CPT, DRG, ICD-10-CM, ICD-10-PCS) based on documentation provided in the patient's medical record. Medical billing is the process of facilitating coded claims with insurance companies and third-party payers' Healthcare Benefit Programs to receive payment for services rendered by a physician or a Qualified Healthcare Professional ("QHP") such as a nurse practitioner ("NP") or physician assistant ("PA").

35. Clinical documentation ("CD") is the information that the physician or QHP responsible for a patient's medical care enters into a medical record, which is a repository for an individual's health information. When a patient encounter occurs, the Provider details the visit or

service in the patient's medical record and explains why the provider delivered specific services, items, or procedures. Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes. These records consist of accurate, timely, specific diagnoses, and procedures that are translated into coded data to represent a patient's clinical status. The coded data is then used for various purposes, including billing for insurance reimbursement. Accurate and complete clinical documentation is at the core of every patient encounter. It has become the foundation of patient health records and is essential for compliant medical billing and coding in order to justify reimbursements to payers such as the Healthcare Benefit Programs.

36. Medicare requires all services provided to a Medicare beneficiary to be authenticated by the person(s) responsible for rendering the care. Prior to healthcare claims submission to Medicare, all billable services must have supported clinical documentation that meets Medicare's signature requirements as set forth in the Medicare Program Integrity Manual, Pub. 100-08, Chapter 3 - Section 3.3.2.4. Through the process of submitting claims to Medicare for reimbursement, the physician/QHP is attesting that all Medicare signature requirements have been met. Clinical documentation entries must be legible, dated, and signed by the rendering physician/provider with identifying credentials. Clinical documentation with missing or invalid signatures are considered incomplete entries and are not reimbursable by Medicare.

37. In submitting claims for reimbursement, Providers are required to use the American Medical Association's Current Procedural Terminology numeric billing codes ("CPT Codes") to describe the procedures or services they rendered. 45 C.F.R. §§ 162.1002(a)(5) and 162.1002(b)(1); Medicare Claims Processing Manual, Pub. 100-04, Chapter 23, Fee Schedule Administration and Coding Requirements, Section 20. The CPT Codes specifically identify the

medical service or services provided to the Beneficiary. To bill using any CPT Code, the services furnished must meet the definition and service requirements of the CPT Code. The service Provider must ensure that the codes selected accurately reflect the services furnished.

38. The Healthcare Benefit Programs cover E/M services or "office visits" when certain requirements are met. E/M services are cognitive (as opposed to procedural) services in which a licensed physician or other QHP personally diagnoses and treats illness or injury.

39. A physician or other QHP is an individual who is qualified by education, training, licensure/regulation (when applicable), and facility privileging (when applicable) who performs a professional service within his/her scope of practice and independently reports that professional service.

40. These professionals are distinct from "clinical staff." A clinical staff member is a person who works under the supervision of a physician or other QHP and is allowed by law, regulation and facility policy to perform or assist in the performance of a specified professional service but does not individually report that professional service. Clinical staff relevant to this action include Covid-19 swabbers and medical assistants who – *under the supervision of a licensed physician or other QHP* – perform basic patient care, including tasks such as collecting patient information, taking patient vitals, informing the patient about the COVID-19 test and what to expect, administering the nasal swab, placing the swab into the specimen tube, and providing the patient with post-testing instructions and information.

41. The CPT Codes for E/M services are organized into various categories and levels, which are determined by the complexity of a patient visit and documentation requirements. In general, the more complex the visit and the more time *personally spent by the physician or other QHP* in connection with the visit, the higher the level of code a Provider may bill within the

appropriate service category, and the higher the level of reimbursement from the Federal Healthcare Benefit Programs. Appropriate clinical documentation and truthful and accurate coding of E/M services is critical to capturing the medical services provided to patients, and for determining the appropriate reimbursement amount.

42. A physician or other QHP selects the office/outpatient E/M visit level to bill based on either medical decision making ("MDM"), or the total time personally spent by the reporting practitioner. MDM billing criteria should reflect the complexity of the cognitive work related to the diagnosis and assessment of a patient's condition, establishing a diagnosis, assessing the status of a condition and/or selecting a management option. Physicians/QHPs should document the thought processes, including treatment options considered but not selected, that contribute to their diagnosis and treatment plan for the patient. To qualify for a level of MDM, two of the three elements for that level must be met or exceeded.

43. A physician or QHP may also select the office/outpatient E/M visit level to bill based on the total time personally spent by the reporting practitioner. Total time may be used alone to select the appropriate code level for office visit E/M services.

44. A key change in the current billing guidelines is the updated definition of time. Time may be used to select the level of service regardless of whether counseling dominated the encounter. The revised definition of time consists of the cumulative amount of face-to-face and non-face-to-face time *personally spent by the physician or other QHP in care of the patient on the date of the encounter* such as:

- Preparing to see the patient (e.g., review of tests);
- Obtaining and/or reviewing separately obtained history;
- Ordering medications, tests or procedures;
- Documenting clinical information in the electronic health record ("EHR") or other records; and
- Communicating with the patient, family, and/or caregiver(s).

45. In contrast, the following items cannot be counted toward total time when selecting the service level of the encounter:

- Time spent by clinical staff in connection with the encounter;
- Time spent by the physician/QHP in activities normally performed by clinical staff;
- Time spent on a date other than the date of service (e.g., completing documentation on the day after the encounter); and
- Time spent on services that are separately reportable (e.g., independent interpretation and reporting of test results).

46. The time-based CPT Codes for E/M services directly implicated by Defendants' fraudulent billing scheme are 99202-99203 and 99211-99213.

47. The 99202 and 99203 E/M Codes apply to "new patients" – i.e., individuals who did not receive any professional services from the physician or QHP or another physician of the same specialty who belong to the same group practice within the previous three years:

- 99202 - Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, *15-29 minutes of total time* is spent on the date of the encounter. *The total time spent must be personally spent by the physician or QHP.*

- 99203 - Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and low level of medical decision making. When using time for code selection, *30-44 minutes of total time* is spent on the date of the encounter. *The total time spent must be personally spent by the physician or QHP.*

48. The 99211-99213 E/M Codes, in turn, apply to "established patients" – i.e., individuals who receive any professional services from the physician/QHP or another physician of the same specialty who belong to the same group practice within the previous three years:

- 99211 - Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician or other QHP. *Zero total time personally spent by physician or QHP in care of patient but does require direct on-site supervision of a physician or QHP in order to bill (commonly referred to as the "Nurse Visit").*

- 99212 – Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, *10-19 minutes of total time* is spent by the physician/QHP on the date of the encounter. *The total time spent must be personally spent by the physician or QHP.*
- 99213 - Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and low level of medical decision making. When using time for code selection, *20-29 minutes of total time* is spent on the date of the encounter. *The total time spent must be personally spent by the physician or QHP.*

49. When total time personally spent by the reporting physician or QHP is used for reporting Level 2 or Level 3 E/M Codes, the time defined in the service descriptors is used for selecting the appropriate level of services. The E/M services for which these guidelines apply (a) require a face-to-face encounter with the physician or other QHP, and (b) require the physician or QHP to personally spend the specified amount of time in connection with the visit (15-29 minutes, 30-44 minutes, 10-19 minutes, or 20-29 minutes, depending on which Level 2 or Level 3 code is used).

50. Conversely, if a physician or QHP does not have a face-to-face encounter with the patient, does not personally spend the requisite amount of time in connection with the visit, or if the physician's or QHP's time is spent in the supervision of clinical staff who perform the face-to-face services of the encounter, the "Nurse Visit" E/M Code (99211 – Total Encounter Time "0") must be used.

51. As described in detail below, Defendants routinely and as their standard practice and procedure (a) misused the four "face-to-face visit by physician/QHP" E/M Codes – 99202 and 99212 (the "Level 2 Codes") and 99203 and 99213 (the "Level 3 Codes") – to upcode patient testing encounters even though a physician or QHP personally spent no time, or nowhere near the required time, on the encounter; and (b) misused the 99211 ("Level 1 Code") where there was no

physician or QHP on-site to directly supervise the face-to-face services provided by the clinical staff.

52. Regardless of whether a patient encounter is improperly upcoded to Level 1, Level 2, or Level 3, the result is a substantially higher reimbursement for the visit than is allowed by applicable law.

## E. Structure and Management of Defendants' Heal 360 Testing Centers.

53. At all times relevant to this Complaint, the Medical Practice Defendants, acting under Mohiuddin's direct management and control, were participating providers with the Healthcare Benefit Programs, and received medical and health care reimbursement payments from the Healthcare Benefit Programs for COVID-19 testing services provided to Beneficiaries.

54. The Medical Practice Defendants hold themselves out, across multiple states, as primary & urgent care family medical practices offering operating under the tradename "Heal 360" and providing, among other things, "Urgent Care, Covid Testing & Vaccinations for your family."[5]

55. Mohiuddin is a citizen of the United States and a physician licensed by the State of Texas. According to public records maintained by the State of Texas, Mohiuddin is the sole Manager of Defendant Urgent Care, a Texas professional limited liability company. Exhibit B.

56. According to public records maintained by the State of Texas, Mohiuddin and his wife, Farheena Azam, are the sole Managers of Defendant Primary Care, a Texas professional limited liability company. Exhibit C.

57. Mohiuddin was also the Chief Executive Officer ("CEO") of each of the Medical Practice Defendants. In his dual capacities of Manager and CEO, Mohiuddin managed the affairs of the Medical Practice Defendants and, individually (with respect to Urgent Care) or together

---

[5] https://www.heal360.com/?gclid=EAIaIQobChMIkZyq-prV9wIVF25vBB2lEQPFEAAYASAAEgIe6fD_BwE

with his wife (with respect to Primary Care), had full, complete and exclusive power to manage and control their respective businesses and operations.

58. Mohiuddin's authority and control included (a) formation, staffing, and operation of the COVID-19 testing sites described below; (b) establishing and enforcing policies and procedures for the delivery of COVID-19 testing at the sites, selection of medically necessary diagnostic-testing and related services provided at the sites; and (c) directing and overseeing coding and billing functions for the purpose of collecting reimbursements from the Federal Healthcare Benefit Programs.

59. In addition, Mohiuddin possessed and exercised the authority to designate, direct, and control the other senior officers of the Medical Practice Defendants, including Chief Operating Officer Osman Mohammed ("Osman"), who was Mohiuddin's brother-in-law and oversaw the day-to-day operational functions of the business and, under Mohiuddin's supervision, implemented and executed the above-described business functions of the Medical Practice Defendants.[6]

60. According to public records maintained by the State of Texas, the registered corporate office for each of the Medical Practice Defendants is 1313 Bravura Dr., Plano, TX 75074 (the "Bravura Residence"). According to the public real property records of Collin County, Texas, the Bravura Residence is a single-family home owned by the "Mm & Fa Family Revocable Trust." "Mm" and "Fa" are, on information and belief, the initials of Mohammed Mohiuddin and Farheena Azam – i.e., Mohiuddin and his wife – who live together at the Bravura Residence, which is also the corporate headquarters of the Medical Practice Defendants. Exhibit D.

[6] The Defendant Medical Practices had four *de facto* COOs, each assigned to oversee management and billing and management of a geographic or other division of Defendants' Covid-19 Testing Sites: (i) Osman – California and Houston, Texas "A Sites"; (ii) Faisal Khan – Plano, Wylie, and Richardson, Texas "B Sites"; (iii) Abdul Manan – 10 "C Sites" under the "WellHealth" tradename; and (iv) Omar Siddiqui – Frisco and Mesquite, Texas "D Sites."

61. On information and belief, based on the above-described corporate structure and his control of both companies, Mohiuddin is also a principal and controlling owner of each Medical Practice Defendant.

**F. <u>Magnitude of Defendants' Fraudulent COVID-19 Testing Reimbursement Scheme.</u>**

62. From at least April 2020 through March 22, 2022, the Medical Practice Defendants, operating under Mohiuddin's direct management and control, acted in concert with actual knowledge, deliberate ignorance of or reckless disregard of the laws, regulations and guidance applicable to the Federal Healthcare Benefit Programs, and submitted and/or caused the submission of enormous volumes of false and fraudulent claims to the Healthcare Benefit Programs for diagnostic testing services during the COVID-19 pandemic that were not performed as billed, not medically necessary, or not provided as represented and ineligible for reimbursement.

63. The Medical Practice Defendants, operating under Mohiuddin's direct management and control, operated dozens of drive-through, mobile, and "pop-up" COVID-19 testing facilities in the Dallas-Fort Worth Metroplex and Greater Houston metropolitan areas of Texas, and various parts of Oklahoma, California, New York, and Michigan (collectively, the "Testing Sites").

64. Some of the Testing Sites operated by Defendants in furtherance of their fraudulent billing scheme included:

- Heal 360 Houston COVID Testing Center, 14485 Bellaire Blvd, Houston, TX 77083
- Heal 360 Arlington Drive-Thru Clinic, 1010 N Collins St, Arlington, TX 76011
- Heal 360 Dallas North Drive-Thru Clinic, 9330 N Central Expy, Dallas, TX 75231
- Heal 360 Mesquite Drive-Thru Clinic, 6500 Northwest Dr #200, Mesquite, TX 75150, USA
- Heal 360 Frisco Preston Rd / Wade Blvd. Drive-Thru Clinic, 8501 Wade Blvd, Frisco, TX 75034

- Heal 360 Frisco Primary Care & Drive-Thru Care, 9229 Lebanon Rd, Frisco, TX 75034
- Heal 360 Wylie Primary Care & Drive-Thru Care, 2806 E Farm to Market Rd 544, Wylie, TX 75098
- Heal 360 Plano Primary Care & Drive-Thru Care, 1360 Star Ct, Plano, TX 75074
- Heal 360 Richardson Drive-Thru Clinic, 1260 W Spring Valley Rd, Richardson, TX 75080
- Heal 360 Allen Primary Care & Drive-Thru Care, 940 W Stacy Rd Suite 110, Allen, TX 75013
- Heal 360 Las Colinas Primary Care & Drive-Thru Care, 5260 N O'Connor Blvd #170, Irving, TX 75039
- Heal 360 Garland: 3320 Lavon Dr, Garland, TX 75040
- Heal 360 Fieldhouse Frisco, 6155 Sports Village Rd, Frisco, TX 75033
- Heal 360 Stonebriar Mall, 8049 Gaylord Pkwy, Frisco, TX 75034
- Heal 360 McKinney, 5101 McKinney Ranch Pkwy, McKinney, TX 75070
- Heal 360 Fieldhouse Mansfield, 650 U.S. 287 Frontage Rd, Mansfield, TX 76063
- Heal 360 Royal Lane Baptist Church, 6707 Royal Ln, Dallas, TX 75230
- Heal 360 BF Phillips Park, 3335 Timber Ridge Dr, Frisco, TX 75034
- Heal 360 Spring ISD Learning Center Urgent Care, 17125 Ella Blvd, Houston, TX 77090
- Heal 360 California, 8062 Garden Grove Blvd, Garden Grove, CA 92844
- Gardena YMCA Urgent Care, 1000 Artesia Blvd, Gardena, CA 90248
- Heal 360 Warren, Michigan, 27423 Van Dyke Ave, Warren, MI, 48093
- Heal 360 Madison Heights Covid Testing Center, 30671 Stephenson Hwy, Madison Heights, MI 48071
- Heal 360 New York, Metro North - Harrison Train Station, 452 Halstead Ave, Harrison, NY

Defendants also operated numerous additional “pop-up” Testing Sites at school districts, churches, mosques, and similar venues in various states, where organizations would permit Defendants to provide COVID-19 testing at a no-cost (to Defendants).

65. The number of daily patient encounters varied by Testing Site and with the ebbs and flows of the COVID-19 pandemic. In late 2021 at the peak of the Delta Variant surge and in early 2022 at the peak of the Omicron Variant surge, many of the Testing Sites averaged between *400 and 900 patient encounters per day* – for example:

| Testing Center | Average Patients Tested Per Day |
|---|---|
| Heal 360 Mesquite Drive-Thru Clinic | 400+ |
| Gardena YMCA Urgent Care | 400+ |
| Heal 360 Garland | 500+ |
| Heal 360 Frisco Primary & Drive Thru Care | 500+ |
| Heal 360 Houston COVID Testing Center | 800+ |
| Heal 360 Frisco Preston Rd / Wade Blvd. Drive-Thru Clinic | 900+ |

66. According to public information published by the HHS in its TAGGS database, Mohiuddin alone had received well over $40 million in reimbursements for COVID-19 testing and another $7 million in reimbursements for COVID-19 treatments under the Uninsured Program as the designated Provider. Exhibit A. This figure does not include Uninsured Program reimbursements made to the Medical Practice Defendants as designated Provider, or reimbursements under other Federal Healthcare Benefit Programs.

67. To place those figures in context, when total claims paid through the government's Uninsured Program for testing are sorted by dollar value from largest to smallest, Mohiuddin ranks 45th out of 50,249 Providers – meaning that he received more money from the Uninsured Program than 99.9% of the participating Providers across the United States. In fact, Mohiuddin (until two years ago a small-scale family practice physician) is the highest reimbursed individual provider through the Uninsured Program by a delta of approximately 24 million dollars and is positioned

at the very top of reimbursed provider rankings alongside Fortune/S&P 500 companies operating some of the largest clinical laboratories in the world.

## G. The Relator and his Employment with the Medical Practice Defendants.

68. In 2011, Relator moved with his family from his home country of India to Texas, where he became a U.S. citizen in 2016. He attended high school and college in Texas, graduating from the University of Texas at Dallas with a degree in healthcare management in August 2021. Upon graduating from college, Relator accepted employment with the Medical Practice Defendants as a Testing Site Supervisor at the Heal 360 Wylie Primary Care & Drive-Thru Care

69. From August 21, 2021 to February 19, 2022, Relator managed up to four Testing Sites operated by Defendants in the Dallas-Fort Worth Metroplex.

70. As a Testing Site supervisor, Relator personally observed and was trained and instructed on (a) the nature, scope, workflows, and volume of the patient encounters and diagnostic testing provided at the Testing Sites, and (b) the Medical Practice Defendants' coding and billing policies, practices, and procedures for the purpose of generating federal insurance payments. In addition to his first-hand involvement in those activities at the four Testing Sites to which he was assigned, and by virtue of his employment with the Medical Practice Defendants, Relator had access to healthcare claims transactional data and medical record documentation for other Testing Sites operated by Defendants.

71. During the relevant time period, the Medical Practice Defendants operating under Mohiuddin's direct management and control, understaffed the Testing Sites with no or virtually no physicians and a grossly inadequate number of on-site QHPs, consisting primarily of a handful of NPs. Depending on how the encounter was coded, the QHP's ostensibly spent 10-19 minutes, 15-29 minutes, 20-29 minutes, or 30-44 minutes of personal time in the care of each and every patient

on the date of the encounter (with respect to the visits coded Level 2 or Level 3), and provided direct on-site supervision to the clinical staff for all of the encounters. That did not happen. Rather, it was the clinical staff – i.e., the swabbers, medical assistants, and other non-QHP personnel employed by Defendants ("Clinical Staff") – that had all face-to-face patient interaction, collected and recorded patient information, and administered the COVID-19 tests.

72. Given that each QHP was responsible for remote handling of multiple Testing Sites located many miles apart, and given that many individual Testing Sites processed as many as 500 or even 900 patients in a single day, it was physically and temporally impossible for a QHP to have a face-to-face encounter with even a tiny fraction of the patients allocated by Defendants to the QHP for Medicare coding and billing purposes on any given day – much less to "personally spend 10 (or 15 or 20 or 30) minutes in care of each patient on the date of the encounter" as would be required for a visit to qualify for Level 2 or Level 3 Coding. It was also impossible for a QHP to provide direct on-site supervision to clinical staff as was required to code a patient encounter for Level 1 reimbursement. To be clear, if a physician or QHP was not on-site at the Testing Site – as was the case regarding a substantial majority of Defendants' patient encounters – it was impermissible for Defendants to bill that patient encounter at Level 2, Level 3, or even at Level 1.

73. The medical coding process implemented and utilized by Defendants started directly at the Testing Sites, when the Clinical Staff recorded patient information into the Medical Practice Defendants' electronic medical records system. Patients visited the mobile COVID-19 Testing Sites to be tested for COVID-19 and briefly met with the Clinical Staff, who typically interacted with patients for less than five minutes, which included sometimes collecting insurance information, interviewing patients regarding COVID-19 exposure and symptoms, and administering a nasal swab for COVID-19 testing. Patients typically remained in their cars

throughout the testing process and never saw or communicated with a physician or QHP. The Clinical Staff routinely performed these functions without on-site supervision from a physician or QHP.

74. The patient information collected by the Clinical Staff at the Testing Sites was then sent to remote teams of medical coders located in India and in Plano, Texas. Given that the coding teams were located remotely (including overseas in a foreign country some eight-thousand miles from the Testing Sites where the services were provided), the coders had no personal involvement in the patient encounters and no personal knowledge of the patient information recorded in the underlying CDs. That data should have been reviewed by a provider with personal knowledge in order to accurately connect the services rendered, on a patient-by-patient basis, with the billing codes related to the diagnosis, procedure, charge, and professional code associated with those services. In reality, the remote coding teams reflexively coded the patient encounters to Level 2 or Level 3 in accordance with the training and instructions provided by Defendants.

75. Defendants instructed and trained their coders – primarily the remote coding teams and, when necessary to catch up on the backlog of uncoded patient encounters, Testing Site supervisors such as the Relator – to document all patient encounters using generic electronic templates that were prepopulated with certain data and pre-coded for a Level 2 or Level 3 visit. Thus, Defendants as a standard practice and procedure, coded patient encounters at the Testing Sites to Level 2 or Level 3 without regard to whether a physician or QHP was physically present or interacted with the patient, and without regard for the amount of time (if any) personally spent by a physician or QHP on the patient visit.

76. This fact is corroborated by videotaped training sessions during which Faisal Khan – the COO of the Plano, Wylie, and Richardson, Texas "B Sites" – instructed Relator and other

Testing Site supervisors to document patient information at Defendants' Testing Sites using only one of two pre-populated electronic NP templates and taught them how to do it.

77. Contrary to Defendants' standard Level 2 or Level 3 coding and billing practice, most of the patient encounters at the Testing Sites did not meet the minimum requirements for the Level 2/Level 3 E/M services to which they were coded and billed. These encounters involved no face-to-face consultation with a licensed physician, no or extremely limited face-to-face consultation with a QHP, and nowhere near the "minimum time spent" QHP service requirement for billing the visits as E/M services under a Level 2 or Level 3 Code. To the extent that Defendants coded encounters as Level 1, they did not meet even the minimal requirements for Level 1 coding due to lack of direct on-site supervision by a QHP.

78. Although Mohiuddin was not physically present or personally involved in the vast majority (if any) of the hundreds of thousands of patient visits at the Testing Sites, Defendants' standard practice and procedure was for the remote coding teams to notify Mohiuddin on roughly a daily basis when coding of all outstanding encounters for each Testing Site was complete. Upon receipt of notice from the remote coders, Mohiuddin would access, remotely from his office, all coded testing templates for the Testing Site on his computer, click "select all" to apply his signature to all templates simultaneously, and click a second button to lock all the coding templates for the Testing Site *en masse*. This automated process took Mohiuddin very little time and was repeated on roughly a daily basis for all patient encounters at every Testing Site. When the QHP's objected to this workflow for locking encounters because they were not permitted to review and sign off their own patients as they should in a clinical setting, their complaints were ignored.

79. As discussed above, under a proper coding and billing protocol, the Provider should transcribe information about their own clinical visits in real time into electronic health records. In

contrast, the Defendant Medical Practice's scribing was performed by the remote teams using generic Level 2/Level 3 templates and generic descriptions for nearly all patients (e.g., checking box "patient alert" even when inapplicable). Further there was no material communication between the onsite QHP providers and the remote coding teams in Plano and India.

80. The Medical Practice Defendants, under Mohiuddin's direct management and control, established, implemented, and enforced the coding processes and procedures for the Testing Sites, and trained the site supervisors such as Relator and the remote coding teams on how to record patient data and code for the services provided at the Testing Sites. Among other things, Defendants instructed the personnel involved in coding to implement the following practices and procedures to falsify additional claims for reimbursement from Healthcare Benefit Programs:

- To use Level 2 and Level 3 Codes, upcoding for vast numbers of patient encounters that were not eligible for any reimbursement or, at most, should have been properly coded as Level 1 Nurse Visits or not eligible for reimbursement at all.
- To use a pre-populated and pre-coded Level 2 or Level 3 electronic nurse practitioner template for coding all or a vast majority of patient encounters even though no nurse practitioner or QHP personally spent any time – much less the minimum required time – on the patient encounter, if they were even on-site at all.
- To upcode all or a vast majority of patient encounters to represent that a 10, 15, 20, or 30-minute doctor or QHP visit with the patient had occurred, even though no doctor or QHP consultation was ever provided and, in the minority of cases where a consultation occurred, lasted perhaps a couple of minutes.
- Failing to diligently (if at all) search for and accurately process private insurance claims as required to support the required reimbursement certification that, to the best of the Provider's knowledge at the time of claim submission, the patient was uninsured at the time the services were provided, i.e., did not have any health care coverage.
- To promote free testing to patients who did not have their insurance card or cash requiring only an ID Card to generate additional claims for reimbursement from Healthcare Benefit Programs.
- To falsely certify that Defendants provided the items and services identified on the claim form to the uninsured individuals identified on the claim form.

- To falsely certify that all information Defendants submitted as part of their applications for payment were true, accurate and complete, and that all items and services for which payment was sought were medically necessary.

81. The Medical Practice Defendants, operating under Mohiuddin's management and control, instructed the remote coding team located in India and Plano to misrepresent services rendered by upcoding the services provided at the majority of the Testing Sites to a Level 2 or Level 3 E/M Services Code indicating that there was a QHP or medical doctor on site for all or substantially all patient encounters, even though there was no nurse practitioner on site at the majority of the Testing Sites and no medical doctor on site at any of the Testing Sites.

82. The Medical Practice Defendants, operating under Mohiuddin's management and control, submitted or caused the submission of false claims to the Healthcare Benefit Programs using Level 2 and Level 3 Codes seeking payments for evaluation and management services that were not provided. Beneficiaries at the Mobile Testing Sites did not receive evaluation and management services as defined in the Level 2 and Level 3. For many if not most claims, the required QHP were not even at the Testing Site on the dates they reportedly provided evaluation and management services at the Testing Sites.

83. The Medical Practice Defendants, operating under Mohiuddin's management and control, listed Mohiuddin as the rendering provider for all E/M services purportedly provided at all the Testing Sites, even though he was rarely if ever present at Testing Sites, and personally provided none or virtually none of the E/M services that were provided at the Testing Sites.

84. The Medical Practice Defendants, operating under Mohiuddin's direct management and control, established, implemented, and enforced the billing processes and procedures for the Mobile Testing Sites, and trained the site supervisors such as Relator how to bill for the services provided at the Mobile Testing Sites. Among other things, Defendants as their standard billing

protocol instructed the staff involved in billing to only bill Level 2 or Level 3 even if the patient encounter should have been billed at Level 1.

85. Defendants did not disclose the above acts and omissions and improper methods of transacting COVID-19 testing business to the government and made inaccurate and untruthful representations in their submissions to the government in seeking payment for services knowingly not provided, or not provided as coded, certified to, and submitted, all in violation of the applicable statutory and regulatory standards. Defendants' regulatory compliance was a material condition to each and every payment decision made by the government and the very basis of the bargain between Defendants and the government. But for Defendants' fraudulent misrepresentations and omissions, the government would not have made the payments in issue to Defendants. The government did not have knowledge of the above-described fraudulent and misleading acts, omissions, and statements because the scheme, as deliberately constructed and implemented by Defendants, was designed to conceal their wrongful conduct and avoid notice to the government.

86. Defendants' fraudulent and improper coding practices described above were a material condition of and material for every reimbursement payment decision made by the government to Defendants for the fraudulent COVID-19 testing services submitted by Defendants for payment.

87. The Medical Practice Defendants, operating under Mohiuddin's direct management and control, submitted and caused to be submitted millions of dollars in claims to the Healthcare Benefit Programs for evaluation and management services in connection with COVID-19 testing that were not performed, medically unnecessary, not provided as represented and ineligible for reimbursement.

88. The Medical Practice Defendants, operating under Mohiuddin's direct management and control, generated millions of dollars in profits as a result their fraud, waste, and abuse scheme related to the delivery of COVID-19 testing.

89. Mohiuddin personally benefitted from the scheme and used the proceeds of the fraud to fuel a lavish lifestyle. By way of example, Mohiuddin's personal vehicle is a Lamborghini with a list price of $300,000.

90. At all times material, within the Northern District of Texas and elsewhere, the Defendants, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Healthcare Benefit Programs, which were Healthcare Benefit Programs, as that term is defined under Title 18, United States Code, Section 24(b), and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of the Healthcare Benefit Programs, in connection with the delivery of and payment for health care benefits, items and services.

91. It is Defendants' burden to prove the legitimacy of every claim submitted for reimbursement by the Healthcare Benefit Programs. They cannot meet that burden because their coding and billing practices were premised on upcoding to more expensive services or procedures than were provided or performed and performing medically unnecessary diagnostic-testing and related services solely for the purpose of generating federal insurance payments.

## CAUSES OF ACTION

### Count I - False Claims Act: Presentment of False Claims
31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)

92. Plaintiff re-alleges and incorporates by reference the paragraphs above as though fully set forth herein.

93. The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government.

94. When submission of such false claims is discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1).

95. Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1).

96. Specifically, as alleged herein, Defendants have submitted false claims for reimbursement for E/M services. Defendants fraudulently overbill services by submitting claims to CMS for E/M services not performed or not performed as coded.

97. Further, as alleged herein, Defendants have submitted false claims for reimbursement for COVID-19 related medical care no provided and when the care they provided did not meet CMS critical care requirements and when the COVID-19 testing services as coded, presented and paid were not provided or otherwise proper for reimbursement.

98. Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

99. Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., CMS would not authorize reimbursements of claimed services if it was aware of Defendants' fraud).

100. By reason of Defendants' actions, the United States has incurred and continues to incur damages.

101. By submitting claims to Medicare for payment for services not performed or provided in accordance with Medicare requirements, the Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to the United States, in violation of 31 U.S.C. § 3729(a)(1).

102. By virtue of the false or fraudulent claims and scheme to defraud as made, caused to be made and engaged in by Defendants, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

103. Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government. See 31 U.S.C. § 3729(a)(1)(B).

104. Through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B).

105. By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count II - False Claims Act: Making or Using False Record or Statement**
31 U.S.C. § 3729(a)(1)(B) and 31 U.S.C. § 3729(a)(2)

106. Plaintiff re-alleges and incorporates by reference the paragraphs above as though fully set forth herein.

107. Defendants knowingly made, used, or caused to be made or used, false records or false statements material to getting false or fraudulent claims paid or approved by the United States.

108. By virtue of the false or fraudulent claims made or caused to be made by the defendant, the United States suffered damages and therefore is entitled to statutory and treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## REQUEST FOR RELIEF

WHEREFORE, Relator requests that Defendants be summoned to appear and answer this action, and upon final trial the Court enter judgment against Defendants, jointly and severally, for statutory damages under the FCA, together with civil penalties, pre- and post-judgment interest, attorneys' fees, and costs of suit provided by law, and all further legal or equitable relief as may be just and proper.

Date: June 21, 2022

Respectfully submitted,

By: */s/ Connor G. Sheehan*

Connor G. Sheehan
Texas Bar No. 24046827
csheehan@dunnsheehan.com
Patrick K. Sheehan
patsheehan@dunnsheehan.com
Texas Bar No. 18175500
William D. Dunn
Texas Bar No. 24002023
ddunn@dunnsheehan.com
**DUNN SHEEHAN LLP**
5910 N. Central Expressway
Suite 1310
Dallas, Texas 75206
Telephone: 214.855.0077
Facsimile: 214.866.0070

# EXHIBIT A

| | | | | | |
|---|---|---|---|---|---|
| **TAGGS COVID19 Uninsured Relief Fund Export** | | | | | |
| Provider Name | City | State | Claims Paid By Treatment | Claims Paid By Testing | Claims Paid By Vaccine |
| MOHAMMED A MOHIUDDIN | IRVING | TX | $0 | $554 | $0 |
| MOHAMMED A MOHIUDDIN | LITTLE ELM | TX | $6,902 | $169,117 | $40 |
| MOHAMMED A MOHIUDDIN | WYLIE | TX | $7,159,592 | $40,009,369 | $91,793 |
| | | | Treatment: $7,166,494 | Testing: $40,179,040 | Vaccination: $91,833 |
| | | | | | |
| **Exported on 06 / 05 / 2022 from the HHS Tracking Accountability in Government Grants System (TAGGS), http://taggs.hhs.gov** | | | | | |

| TAGGS COVID19 Uninsured Relief Fund Export | | | | | |
|---|---|---|---|---|---|
| Note : Only first 25000 records exported. | | | | | |
| Provider Name | City | State | Claims Paid By Treatment | Claims Paid By Testing | Claims Paid By Vaccine |
| | | | Treatment: $0 | Testing: $0 | Vaccination: $0 |
| CURATIVE LABS INC | WASHINGTON | DC | $59,206,200 | $586,931,650 | $0 |
| FULGENT THERAPEUTICS L | TEMPLE CITY | CA | $0 | $505,412,250 | $1,974,688 |
| LABORATORY CORPORATION | BURLINGTON | NC | $6,814,333 | $297,451,262 | $0 |
| HELIX OPCO LLC | SAN MATEO | CA | $356,375 | $227,335,100 | $0 |
| NOMI HEALTH INC | SALT LAKE CITY | UT | $0 | $226,174,599 | $0 |
| QUEST DIAGNOSTICS INCO | SAINT LOUIS | MO | $3,226,282 | $223,390,403 | $0 |
| AEGIS SCIENCES CORPORA | NASHVILLE | TN | $14,018,623 | $216,650,924 | $0 |
| O HARE CLINICAL LAB SE | PARK RIDGE | IL | $0 | $187,153,096 | $0 |
| LABORATORY CORPORATION | BURLINGTON | NC | $2,240,485 | $177,767,065 | $0 |
| MEDSTAR LABORATORY INC | HILLSIDE | IL | $1,517 | $164,969,065 | $0 |
| NORTHSHORE CLINICAL LA | CHICAGO | IL | $262 | $164,871,700 | $370,342 |
| DOCTORS CLINICAL LABOR | ROLLING MEADOWS | IL | $0 | $152,076,914 | $0 |
| AIT LABORATORIES | DENTON | TX | $956,858 | $115,417,101 | $0 |
| NOMI HEALTH INC | JACKSONVILLE | FL | $0 | $108,803,721 | $0 |
| GENETWORX | GLEN ALLEN | VA | $392,714 | $105,192,696 | $0 |
| MEDLAB2020 INC | ORANGE | CA | $0 | $103,327,865 | $0 |
| CRESTVIEW CLINICAL LAB | IRVINE | CA | $1,434,030 | $100,382,006 | $0 |
| INFINITY DIAGNOSTICS | TETERBORO | NJ | $0 | $100,062,374 | $40 |
| DART MEDICAL LABORATOR | BROOKLYN | NY | $66 | $95,231,278 | $0 |
| BIO REFERENCE LABORATO | PORT CHESTER | NY | $2,099,763 | $94,222,072 | $0 |
| INFINITY BIOLOGIX LLC | PISCATAWAY | NJ | $10,142,800 | $91,743,200 | $0 |
| DX SOLUTIONS LLC | NICHOLASVILLE | KY | $740,671 | $90,522,117 | $0 |
| SIGNAL DIAGNOSTICS LLC | LOS ANGELES | CA | $33,373 | $83,219,896 | $0 |
| LAB ELITE LLC | CHICAGO | IL | $0 | $77,229,981 | $0 |
| QUEST DIAGNOSTICS | TETERBORO | NJ | $787,290 | $73,442,058 | $0 |
| CENTERS LAB NJ LLC | BRONX | NY | $18,179 | $71,061,762 | $0 |
| MINUTECLINIC DIAGNOSTI | FRISCO | TX | $4,204,988 | $61,766,173 | $122,600 |
| ACCESS DX LABORATORY L | HOUSTON | TX | $15,872,875 | $55,880,784 | $0 |
| QUEST DIAGNOSTICS | WEST HILLS | CA | $927,203 | $53,238,459 | $0 |
| SUMMER DIAGNOSTICS LLC | HOUSTON | TX | $0 | $51,122,359 | $0 |
| NATIONAL CLINICAL LABS | CHICAGO | IL | $0 | $50,724,480 | $0 |
| SOUTHERN WESTCHESTER U | YONKERS | NY | $2,999,099 | $49,711,721 | $292,609 |
| MINUTECLINIC DIAGNOSTI | BOYNTON BEACH | FL | $2,276,894 | $48,779,444 | $264,879 |
| SONORA QUEST LABORATOR | PHOENIX | AZ | $423,037 | $46,864,158 | $0 |
| VIKOR SCIENTIFIC LLC | CHARLESTON | SC | $357,107 | $46,711,656 | $0 |
| UNIVERSITY OF WASHINGT | SEATTLE | WA | $5,300 | $46,129,461 | $0 |
| AVELLINO LABS USA INC | MENLO PARK | CA | $0 | $45,940,333 | $0 |
| DOCTORS HOSPITAL TIDWE | HOUSTON | TX | $29,188,948 | $42,232,057 | $3,551,444 |
| QUEST DIAGNOSTICS INC | WASHINGTON | DC | $5,537,972 | $41,733,112 | $0 |
| MOHAMMED A MOHIUDDIN | WYLIE | TX | $7,198,992 | $40,008,369 | $91,790 |
| AKESOGEN INC | PEACHTREE CORNERS | GA | $376,400 | $39,374,675 | $0 |
| LIFESCAN LABS OF ILLIN | SKOKIE | IL | $79,829 | $38,279,778 | $0 |
| SIERRA HOME HEALTH CAR | IRVINE | CA | $0 | $37,266,518 | $0 |

# EXHIBIT B

Form 424
(Revised 05/11)
Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
Filing Fee: See instructions

**Certificate of Amendment**

This space reserved for office use.

FILED
In the Office of the
Secretary of State of Texas
APR 06 2015
Corporations Section

## Entity Information

The name of the filing entity is:

A-5 MEDICAL ASSOCIATES CTR, LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

- ☐ For-profit Corporation
- ☐ Nonprofit Corporation
- ☐ Cooperative Association
- ☒ Limited Liability Company
- ☐ Professional Corporation
- ☐ Professional Limited Liability Company
- ☐ Professional Association
- ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: 801877105

The date of formation of the entity is: 11/04/2013

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

HEAL 360 URGENT CARE, PLLC

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

**Registered Agent**
**(Complete either A or B, but not both. Also complete C.)**

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

OR
☒ B. The registered agent is an individual resident of the state whose name is:

| Mohammed | Amer | Mohiuddin | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

| 1313 Bravura Drive | Plano | TX | 75074 |
|---|---|---|---|
| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☒ Add each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

Mohammed Amer Mohiuddin
Manager
1313 Bravura Drive
Plano, TX 75074 USA

The entity will provide medical and urgent care services to the general public.

☐ Alter each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

☒ Delete each of the provisions identified below from the certificate of formation.

Shaukat Gaziani

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ____________________

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: ____________________

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: 3-25-15

By: Amir Faridi

Signature of authorized person

AMIR FARIDI

Printed or typed name of authorized person (see instructions)

# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

*To be filed by Corporations, Limited Liability Companies (LLC) and Financial Institutions*

**This report MUST be signed and filed to satisfy franchise tax requirements**

■ **Tcode** 13196 Franchise

■ Taxpayer number: 3 2 0 5 2 3 9 7 5 2 1

■ Report year: 2 0 2 1

***You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381 or (512) 463-4600.*

| | | | | |
|---|---|---|---|---|
| Taxpayer name: HEAL 360 URGENT CARE, PLLC | | | | |
| Mailing address: 1313 BRAVURA DR | | | | Secretary of State (SOS) file number or Comptroller file number: 0801877105 |
| City: PLANO | State: TX | ZIP Code: 75074 | Plus 4: | |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| | |
|---|---|
| Principal office | 1313 BRAVURA DR PLANO, TX 75074 0107 |
| Principal place of business | 3400 FM 544 SUITE 650, WYLIE, TX 75098 |

***Please sign below!*** Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3205239752121

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| MOHAMMED AMER MOHIUDDIN | MANAGER | ○ YES | |
| Mailing address: 1313 BRAVURA DR. | City: PLANO | State: TX | ZIP Code: 75074 |
| Name: | Title: | ○ YES | |
| Mailing address: | City: | State: | ZIP Code: |
| Name: | Title: | ○ YES | |
| Mailing address: | City: | State: | ZIP Code: |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*

○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: MOHAMMED AMER MOHIUDDIN

| Office | City | State | ZIP Code |
|---|---|---|---|
| 1313 BRAVURA DR. | PLANO | TX | 75074 |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| MJ Ahmed | Electronic | 11-15-2021 | ( 214 ) 636 - 8100 |

**Texas Comptroller Official Use Only**

VE/DE ○ PIR IND ○

# EXHIBIT C

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Professional Limited Liability Company**

**Filed in the Office of the Secretary of State of Texas**
**Filing #: 802379443 01/28/2016**
**Document #: 652599380002**
**Image Generated Electronically for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a professional limited liability company. The name of the entity is:

**HEAL 360 PRIMARY CARE, PLLC**

**Article 2 – Registered Agent and Registered Office**

☐A. The initial registered agent is an organization (cannot be company named above) by the name of:

OR

☑B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:
**Mohammed Amer Mohiuddin**

C. The business address of the registered agent and the registered office address is:

Street Address:
**4013 14th Street**
**Suite 401 Plano TX 75074**

**Consent of Registered Agent**

☐A. A copy of the consent of registered agent is attached.

OR

☑B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑A. The limited liability company is to be managed by managers.

OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

| | |
|---|---|
| Manager 1: **Mohammed Amer Mohiuddin** | Title: **Manager** |
| Address: **4013 14th Street Suite 401 Plano TX, USA 75074** | |

**Article 4 - Purpose**

The company is organized for the rendition of the professional service set forth below:
**provision of medical services to the general public.**

Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Usman Qureshi** **1400 Preston Rd., #400, Plano, TX 75093**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Usman Qureshi**

Signature of Organizer

**FILING OFFICE COPY**

# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

*To be filed by Corporations, Limited Liability Companies (LLC) and Financial Institutions*

**This report MUST be signed and filed to satisfy franchise tax requirements**

■ Tcode 13196 Franchise

■ Taxpayer number: 3 2 0 5 9 4 4 2 8 1 7

■ Report year: 2 0 2 1

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381 or (512) 463-4600.*

Taxpayer name: Heal 360 Praimarycare PLLC

Mailing address: 4013 14TH ST STE 401

Secretary of State (SOS) file number or Comptroller file number: 0802379443

City: PLANO | State: TX | ZIP Code: 75074 | Plus 4:

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 1313 BRAVURA DR PLANO, TX 75074

Principal place of business: 1313 BRAVURA DR PLANO, TX 75074

*Please sign below!* Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3205944281721

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | Term expiration (m m d d y y) | Mailing address | City | State | ZIP Code |
|---|---|---|---|---|---|---|---|
| MOHAMMED AMER MOHIUDDIN | MANAGER | ○ YES | | 4013 14TH STREET SUITE 401 | PLANO | TX | 75074 |
| FARHEENA AZAM | MANAGER | ○ YES | | 4013 14TH STREET SUITE 401 | PLANO | TX | 75074 |
| | | ○ YES | | | | | |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)* ○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: MOHAMMED AMER MOHIUDDIN

Office: 4013 14TH STREET SUITE 401 | City: PLANO | State: TX | ZIP Code: 75074

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| MJ Ahmed | Electronic | 11-15-2021 | ( 214 ) 636 - 8100 |

Texas Comptroller Official Use Only

VE/DE ○ PIR IND ○

# EXHIBIT D

UCC Business Organizations Trademarks Notary Account Help/Fees Briefcase Logout

| | |
|---|---|
| Filing Number: | 801877106 |
| Original Date of Filing: | November 4, 2013 |
| Formation Date: | N/A |
| Tax ID: | 32052387521 |
| Duration: | Perpetual |
| Name: | HEAL 360 URGENT CARE, PLLC |
| Address: | 1313 SHIMURA DR<br>PLANO, TX 75074 USA |

Entity Type: Domestic Limited Liability Company (LLC)
Entity Status: In existence

FEIN:

| Name | Address | Inactive Date |
|---|---|---|
| Mohammed Amer Mohiuddin | 1313 Shimura Dr<br>Plano TX 75074 USA | |

Initiate Change Filing Return to Search

Instructions
To place an order for additional information about a filing press the 'Order' button.

UCC Business Organizations Trademarks Notary Account Help/Fees Briefcase Logout

BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| Filing Number: | 802379443 | Entity Type: | Domestic Limited Liability Company (LLC) |
| Original Date of Filing: | January 28, 2016 | Entity Status: | In existence |
| Formation Date: | N/A | | |
| Tax ID: | 32059443017 | FEIN: | |
| Duration: | Perpetual | | |
| Name: | HEAL 360 PRIMARY CARE, PLLC | | |
| Address: | 1313 BRAVURA DRIVE<br>PLANO, TX 75074 USA | | |

REGISTERED AGENT

| Name | Address | Inactive Date |
|---|---|---|
| [illegible] | [illegible]<br>Plano, TX [illegible] USA | |

Initiate Change Filing Return to Search

Instructions:

- To place an order for additional information about a filing press the 'Order' button

pertysearch?prop=2686510&year=2022

d - C. Chicken Pot Pi (and. SELLING THE PRIMA Life Insurance divor Working Interest O. 20 Hikes That Will... 82194_01.pdf Interlocutory Appe Commercial & Resi... New Tab (no subject) · paloc... 17Q2 - Juniper Inve Selling Your Business...

## Property Search

**Property ID: 2686510 - Tax Year: 2022**

**This property is eFile eligible!**
Click here to eFile your protest.

### General Information

| | |
|---|---|
| Property ID | 2686510 |
| Property Status | Active |
| Geographic ID | R-10309-00B-0180-1 |
| Property Type | Real |
| Property Address | 1313 Bravura Dr<br>Plano, TX 75074 |
| Total Land Area | 6,684 sq. ft. |
| Total Improvement Main Area | 3,846 sq. ft. |
| Abstract/Subdivision | Medina Villas |
| Primary State Code | A (Residential Single-family) |
| Legal Description | MEDINA VILLAS, BLK B, LOT 18 |
| Maps | Interactive Property Map<br>Interactive Subdivision Map<br>Download a plat map |

### Owner Information

| | |
|---|---|
| Owner ID | 1182807 |
| Owner Name(s) | Mm & Fa Family Revocable Trust |
| Exemptions | HS (General Homestead) |
| Percent Ownership | 100.00% |
| Mailing Address | 1313 Bravura Dr<br>Plano, TX 75074-8107 |

Home

Downloads

- Forms
- Reports

Exemptions, Exemptions & Relief

How is Your Property Appraised?

Calendar

Key Annual Cycles

Press Releases

Training & CE

District Information

Boards

- Board of Directors
- Ag Advisory Board
- Appraisal Review Board

Links

- Other Appraisal Districts
- Texas Comptroller Resources
- Tax Offices

Site Search

Help and FAQs

- Helpdesk

JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

3-22CV1333-E

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America Ex. Rel. Syed Hasan, Realtor

**(b)** County of Residence of First Listed Plaintiff Dallas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Connor G. Sheehan and William D. Dunn, Dunn Sheehan LLP
5910 N. Central Expressway, Dallas, TX 75206

**DEFENDANTS**

Heal 360 Urgent Care PLLC, Heal 360 Primary Care PLLC, and Dr. Mohammed Amer Mohiuddin

County of Residence of First Listed Defendant Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
JUN 21 2022
mb
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

[ ] 110 Insurance
[ ] 120 Marine
[ ] 130 Miller Act
[ ] 140 Negotiable Instrument
[ ] 150 Recovery of Overpayment & Enforcement of Judgment
[ ] 151 Medicare Act
[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
[ ] 153 Recovery of Overpayment of Veteran's Benefits
[ ] 160 Stockholders' Suits
[ ] 190 Other Contract
[ ] 195 Contract Product Liability
[ ] 196 Franchise

**PERSONAL INJURY**
[ ] 310 Airplane
[ ] 315 Airplane Product Liability
[ ] 320 Assault, Libel & Slander
[ ] 330 Federal Employers' Liability
[ ] 340 Marine
[ ] 345 Marine Product Liability
[ ] 350 Motor Vehicle
[ ] 355 Motor Vehicle Product Liability
[ ] 360 Other Personal Injury
[ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
[ ] 365 Personal Injury - Product Liability
[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
[ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
[ ] 370 Other Fraud
[ ] 371 Truth in Lending
[ ] 380 Other Personal Property Damage
[ ] 385 Property Damage Product Liability

[ ] 625 Drug Related Seizure of Property 21 USC 881
[ ] 690 Other

[ ] 710 Fair Labor Standards Act
[ ] 720 Labor/Management Relations
[ ] 740 Railway Labor Act
[ ] 751 Family and Medical Leave Act
[ ] 790 Other Labor Litigation
[ ] 791 Employee Retirement Income Security Act

[ ] 422 Appeal 28 USC 158
[ ] 423 Withdrawal 28 USC 157

[ ] 820 Copyrights
[ ] 830 Patent
[ ] 835 Patent - Abbreviated New Drug Application
[ ] 840 Trademark
[ ] 880 Defend Trade Secrets Act of 2016

[ ] 861 HIA (1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

[ ] 870 Taxes (U.S. Plaintiff or Defendant)
[ ] 871 IRS—Third Party 26 USC 7609

[ ] 375 False Claims Act
[x] 376 Qui Tam (31 USC 3729(a))
[ ] 400 State Reapportionment
[ ] 410 Antitrust
[ ] 430 Banks and Banking
[ ] 450 Commerce
[ ] 460 Deportation
[ ] 470 Racketeer Influenced and Corrupt Organizations
[ ] 480 Consumer Credit (15 USC 1681 or 1692)
[ ] 485 Telephone Consumer Protection Act
[ ] 490 Cable/Sat TV
[ ] 850 Securities/Commodities/ Exchange
[ ] 890 Other Statutory Actions
[ ] 891 Agricultural Acts
[ ] 893 Environmental Matters
[ ] 895 Freedom of Information Act
[ ] 896 Arbitration
[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
[ ] 950 Constitutionality of State Statutes

[ ] 210 Land Condemnation
[ ] 220 Foreclosure
[ ] 230 Rent Lease & Ejectment
[ ] 240 Torts to Land
[ ] 245 Tort Product Liability
[ ] 290 All Other Real Property

[ ] 440 Other Civil Rights
[ ] 441 Voting
[ ] 442 Employment
[ ] 443 Housing/ Accommodations
[ ] 445 Amer. w/Disabilities - Employment
[ ] 446 Amer. w/Disabilities - Other
[ ] 448 Education

**Habeas Corpus:**
[ ] 463 Alien Detainee
[ ] 510 Motions to Vacate Sentence
[ ] 530 General
[ ] 535 Death Penalty
**Other:**
[ ] 540 Mandamus & Other
[ ] 550 Civil Rights
[ ] 555 Prison Condition
[ ] 560 Civil Detainee - Conditions of Confinement

[ ] 462 Naturalization Application
[ ] 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
31 U.S.C. 3729
Brief description of cause:
Qui Tam

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE DOCKET NUMBER

DATE
June 21, 2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE